**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JOHN M. MCDOWELL, JR.,

      Plaintiff,

v.                                    No. 1:20-cv-00153 RB/KK

RIO RANCHO POLICE DEPARTMENT,
a Municipal Agency, CITY OF RIO RANCHO,
a Municipality, OFFICER RICHARD ROMERO,
Personally, and Individually and John Doe(s), in
Their Individual Capacity,

      Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

James Chavez was murdered in July 2011. Defendant Richard Romero led an 18-month investigation into the murder and eventually obtained an arrest warrant for Plaintiff John M. "Jack" McDowell. McDowell was arrested, tried, and found guilty of Chavez's murder in 2013. On appeal, the New Mexico Supreme Court vacated the conviction and remanded the case for a new trial. McDowell was acquitted after the second trial.

McDowell filed suit against Romero, the Rio Rancho Police Department (RRPD), and the City of Rio Rancho. The Court previously granted summary judgment to Defendants on McDowell's state law claims. Defendants now move for summary judgment on the federal claims: wrongful conviction (Count I); false arrest (Count II); false imprisonment (Count III); and excessive force (Count VIII). For the reasons discussed below, the Court will grant the motion.

## I.    Legal Standards

### A.    Summary Judgment Standard

"Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." *Halley v. Huckaby*, 902 F.3d 1136, 1143 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 1347 (2019) (citing *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id.* "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Tanner v. San Juan Cnty. Sheriff's Off.*, 864 F. Supp. 2d 1090, 1106 (D.N.M. 2012) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 256). A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Id.* at 1107 (quotation and citation omitted). Instead, the non-moving party must come forward with "sufficient evidence on which the factfinder could reasonably find" in their favor. *Id.* (citations omitted). Evidence that is "merely colorable," *Anderson*, 477 U.S. at 249, or consists only of "[u]nsubstantiated allegations[,]" *McCoy*, 887 F.3d at 1044, is insufficient.

**B.    Relevant Local Rules**

Pursuant to Local Rule 56, the party moving for summary judgment "must set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists." D.N.M. LR-Civ. 56(b). The movant must number the facts "and must refer with particularity to those portions of the record upon which the movant relies." *Id.* In return, the non-moving party must also provide "a concise statement of the material facts . . . as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with

particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed." *Id.* "**All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.**" *Id.* (emphasis added).

Defendants provide a lengthy statement of Undisputed Material Facts (UMF). (*See* Doc. 41 at 2–23.) McDowell neither relies on the record nor submits evidence to controvert Defendants' factual assertions and instead "restates . . . each and every allegation contained in the second amended complaint . . . as [his] undisputed facts." (Doc. 46 at 2.) McDowell's amended complaint is not verified. (*See* Doc. 25.) Were it verified, the Court could have treated it "as an affidavit for purposes of summary judgment if it satisfie[d] the standards for affidavits set out in [Federal Rule of Civil Procedure 56]." *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1311 (10th Cir. 2010) (quoting *Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988) (per curiam)). Because it is not, his "restatement" of the allegations does not create a genuine dispute of fact. As McDowell does not refer to the record to dispute Defendants' factual assertions, he fails to specifically controvert them. Consequently, the Court deems those facts undisputed and adopts Defendants' recitation of the facts. The Court recounts only those facts necessary to its decision on Defendants' motion.

## II.   Statement of Facts

On July 10, 2011, at 1:31a.m., the Sandoval County Regional Emergency Communications Center received an anonymous 911 call from a person who stated, "[s]omeone came into my friend's house and I think he's dead. I don't know what they did to him . . . . I think they killed him." (Docs. 41-1 at 1–2; 41-1A at 34.) Officers responded to the house at 93 Idaho Creek Drive (the "Chavez House") and found James Chavez (Chavez) deceased due to multiple stab wounds. (Docs. 41-1 at 2, 5; 41-1F at 51–52.) The last known residents of the Chavez House were Chavez and his ex-wife, Catherine Pavelski Chavez (Catherine Chavez). (Doc. 41-1 at 2–3.)

Romero, the on-call detective, responded to the call. (*Id.* at 2.) He "learned from the officers on scene that . . . Chavez had recently been released from jail and was attempting to move back into the residence[,] . . . that there was a possible feud" about the Chavez House between Chavez and his ex-wife, and that Catherine Chavez's boyfriend, John "Blade" McDowell,[1] "had reportedly been making threats against . . . Chavez." (*Id.* at 2–3.) Chavez filed a report in June 2011 and stated that John "Blade" McDowell "threatened his life with a firearm." (*Id.* at 3.) "Chavez reported that John 'Blade' McDowell held him at gunpoint, called Catherine Chavez, who told John 'Blade' McDowell to shoot . . . Chavez." (*Id.*) John "Blade" McDowell did not shoot Chavez. (*Id.*)

Romero obtained a warrant to search the premises. (*Id.*) The search revealed that "the pockets of [Chavez's] jeans had been turned inside out as if someone had rummaged through them." (*Id.* at 4.) Officers found two rubber bra inserts, one lying next to Chavez and one in his pocket. (*Id.*) Officers saw a kitchen table "broken and laying on its side [that] appeared to have been broken in a struggle." (*Id.* at 5.) Chavez had a large gash below his "left wrist that appeared to be defensive . . . ." (*Id.*; Doc. 41-1F at 51–52.) The autopsy listed the cause and manner of death as homicide . . . ." (Docs. 41-1 at 5; 41-1F at 49.)

On July 10, 2011, RRPD Sergeant Brian Thacker interviewed Michelle Decker. (*See* Doc. 41-1G at 53.) Decker believed Catherine Chavez and John "Blade" McDowell were responsible for Chavez's death. (*Id.*) She stated that she had her hair done by Catherine Chavez. (*Id.* at 54.) Catherine Chavez asked Decker "if she knew where James Chavez was, that she would be happy to be rid of him, and that when John ['Blade'] McDowell found him, James Chavez would be dead." (*Id.*) Decker provided contact information for Amanda Newby, who she said also had information about Chavez's death. (*Id.*)

---

[1] The Court refers to Plaintiff as "McDowell" or "Jack McDowell" and to his son as "John 'Blade' McDowell" throughout this Opinion.

Romero interviewed Amanda Newby, who asserted that "she was in a relationship with James Chavez for three years." (Doc. 41-1 at 9.) She stated that when "Chavez was released from jail, Catherine Chavez began harassing [Newby] through her friend, Michelle Decker, over a guitar James Chavez stole from John 'Blade' McDowell." (*Id.*) She stated that Catherine Chavez and John "Blade" McDowell "were looking for James Chavez . . . ." (*Id.*) On the evening of July 10, 2011, Casey Williams called Newby and "told her that she was present when James Chavez was murdered." (*Id.*) Williams told her that "an older man with two younger men" came to the Chavez House on motorcycles, "cornered James Chavez in the kitchen[,] and told [Williams] to get in the garage while they took her phone." (*Id.* at 9–10.) Williams "heard one of the men say . . . 'you stole from me . . . and now I'm going to kill you.'" (*Id.* at 10.) "She heard James Chavez reply, 'I got it, I got it, I'll give you everything back, I got it.'" (*Id.*) The men then killed Chavez. (*Id.*) Newby "believed John 'Blade' McDowell's father was involved in the murder and that his name was Jack McDowell." (*Id.*) Jack McDowell is the plaintiff in this lawsuit. Newby "described Jack McDowell as a retired police officer and a member of the Black Berets motorcycle club, a branch of the Bandidos." (*Id.*)

Romero first interviewed Catherine Chavez on July 11, 2011. (*See* Doc. 41-1H at 55.) She stated that she had no knowledge of Chavez's death. (*Id.*) She asserted that she and John "Blade" McDowell went to his mother's house the evening of July 9, stayed the night there, and did not wake up until the morning of July 10. (*Id.* at 57, 63.)

Romero located Williams and her boyfriend, David Dinelli, on July 11, 2011. (Doc. 41-1 at 11; *see also* Doc. 41-1I at 94.) Williams stated that Chavez was her friend, and she and Dinelli were at the Chavez House to help Chavez clean on July 10, 2011. (Doc. 41-1I at 95.) Three men, one holding a double-barrel shotgun, came into the Chavez House. (*Id.*) The men told Williams

and Dinelli to run. (*Id.*) Dinelli jumped out a window, but Williams did not run. (*Id.*) The men took her phone and identification and put her in the garage. (*Id.*) She could hear one of the men accuse Chavez of stealing, and Chavez replied, "I got it. I got it." (*Id.* at 95–96.) She heard Chavez make a noise like he was injured. (*Id.* at 96.) The men walked out; one man held a knife up and said to her, "Not a word." (*Id.*) The men left on motorcycles. (*Id.* at 96–97.) Williams saw Chavez on the floor and tried to rouse him, but he did not move and eventually stopped breathing. (*Id.* at 96.) Williams used Dinelli's phone to call 911, then Williams and Dinelli left. (*Id.*)

Williams told Romero that she believed the man who killed Chavez was tall, a little overweight, in his late 40s or 50s, white, with salt and pepper or gray hair, wore a bulletproof jacket and a vest with motorcycle patches, and carried a knife. (*Id.* at 97–98.) Williams said the man holding the shotgun was around 28 years old, white, with shoulder length brown hair in a ponytail, and wore a blue baseball cap. (*Id.* at 102, 104.) Williams stated that at some point, the man with the shotgun accused her of helping Chavez "steal from us." (*Id.* at 103.) The third man was around 25 years old, had blonde hair, and was also white. (*Id.* at 104–05.) Williams asserted that Chavez had told her" that his wife put a hit on him." (*Id.* at 96.)

Romero interviewed Dinelli the same day. (*See* Doc. 41-1K at 116.) Dinelli stated that when the three men came in, he jumped out a window and was knocked unconscious by a man outside. (*Id.* at 118.) Dinelli woke up and heard Williams screaming. (*Id.* at 119.) He saw Chavez lying unmoving on the ground. (*Id.*) Dinelli said that the man wearing the blue baseball cap was an acquaintance named Josh who was 20 to 25 years old with short black hair. (*Id.* at 120–21, 123.) Dinelli also heard one of the men say, "You want to steal from me?" and Chavez replied, "I got it." (*Id.* at 126.) Dinelli told Romero that he had seen John "Blade" McDowell previously, but he was not one of the men Dinelli saw in the house. (*Id.* at 130–31.) Romero showed Williams and

Dinelli "three photo arrays with six different individuals, one which contained a picture of" McDowell. (Doc. 41-1 at 16.) Neither witness identified anyone in the photo arrays. (*Id.*) Both Williams and Dinelli stated that Chavez told them he "moved" some dirt bikes that he found in the Chavez House. (*See* Docs. 41-1I at 103; 41-1K at 124.)

Romero interviewed John "Blade" McDowell on July 12, 2011. (Doc. 41-1L at 140.) He stated that he had been dating Catherine Chavez for two years and that he initially had no problems with Chavez. (*Id.* at 143–45.) At some point, he paid Chavez's bond, and in return, Chavez agreed to rent John "Blade" McDowell and Catherine Chavez the Chavez House. (*Id.* at 145.) The pair had recently moved out of the house because Chavez was released from jail. (*See id.* at 153–55.)

He told Romero that someone recently robbed the Chavez House and stole two dirt bikes and other property, and he suspected it was Chavez. (*Id.* at 146, 153.) He stated that a few weeks prior, he was at the Chavez House when Chavez walked in. (*Id.* at 148–49.) He accused Chavez of robbing the house, and Chavez denied it. (*Id.* at 149.) This was the incident in which Chavez filed a police report and stated that John "Blade" McDowell threatened him with a gun. (*See id.*) John "Blade" McDowell denied pulling a gun and said that he does not have a gun. (*Id.*) He asserted that he usually carries a knife and earned the nickname "Blade" because he is good with knives. (*Id.* at 149–50.) He stated that his father always carried a pistol. (*Id.* at 152.) John "Blade" McDowell disavowed any involvement in Chavez's death. (*Id.* at 158.)

"Over the course of the next year, [Romero] and members of [his] department continued" the investigation. (Doc. 41-1 at 18.) The person Dinelli identified, Josh, was cleared as a suspect. (*Id.* at 19.) Otherwise, Romero largely confirmed Williams and Dinelli's stories. (*See id.* at 18–20.) Phone records showed that "Catherine Chavez made [14] calls to John 'Blade' McDowell between 7:30p.m. on July 9, 2011[,] and 1:16a.m. on July 10, 2011 . . . ." (Doc. 41-1J at 115.) She

"made several calls to a number belonging to . . . [Anthony] Villagomez during the same time frame." (*Id.*) DNA testing revealed that the bra inserts found at the crime scene contained DNA belonging to Catherine Chavez. (Doc. 41-1N at 190, 196.)

In June 2012, authorities arrested Catherine Chavez on a charge of felon in possession of firearms. (Doc. 41-1 at 20.) Romero interviewed Catherine Chavez again in July 2012. (*See id.* at 21; Doc. 41-1P.) He confronted her with the evidence regarding the phone records and bra inserts (*See* Doc. 41-1P at 224–26.) She eventually said that McDowell, John "Blade" McDowell, and Villagomez went to the Chavez House on the night of the murder to ask Chavez about stealing. (*Id.* at 236, 240.) She indicated that Villagomez likely had a shotgun. (*See id.* at 235–36.) She stated that there was a struggle, and she assumed that McDowell stabbed Chavez, "because he had a knife." (*Id.* at 243.) She later said that John "Blade" McDowell told her that McDowell stabbed Chavez. (*Id.* at 244.) Catherine Chavez admitted that she lied in her first interview because she was scared for her and her children's safety. (*Id.* at 245.) She stated that McDowell had weapons at his house. (*Id.* at 223.)

Romero conducted a second interview with Dinelli in November 2012. (*See* Doc. 41-1S at 299.) Dinelli admitted that he lied in his first interview. (*See id.* at 306, 312, 315, 319.) He identified the three men present the night Chavez was murdered as Anthony, John, and Jack. (*Id.* at 312–13, 316.) Romero showed Dinelli another set of photo arrays, and Dinelli identified McDowell, John "Blade" McDowell, and Anthony Villagomez as the men responsible for Chavez's murder. (*See* Doc. 41-1 at 25.) Romero gained information from another individual that McDowell and John "Blade" McDowell were involved in distributing 400 pounds of methamphetamine every two weeks. (*See* Doc. 41-1 at 25.)

Romero interviewed Villagomez on August 14, 2012. (*See* Docs. 41-1 at 23; 41-1Q at 259.) Villagomez denied being present when Chavez was murdered. (Doc. 41-1Q at 278.) Romero interviewed Villagomez again in January 2013. (*See* Doc. 41-1T at 325.) Villagomez stated that both McDowell and John "Blade" McDowell were involved with the Black Berets motorcycle club. (*Id.* at 330.) He also asserted that they were involved in distributing methamphetamine. (*See id.* at 331.) Villagomez confirmed that John "Blade" McDowell's dirt bike and other belongings were stolen from the Chavez House and that they suspected Chavez. (*Id.* at 333.) On the night of the murder, Catherine Chavez called John "Blade" McDowell and told him Chavez was at the house. (*Id.* at 334.) McDowell, John "Blade" McDowell, and Villagomez drove to the Chavez House on their motorcycles to beat Chavez up and find out where he'd taken the stolen property. (*Id.*) They parked five houses away at a location where Catherine Chavez was also parked. (*Id.* at 334–35.) Once they got into the house, John "Blade" McDowell physically assaulted Chavez. (*Id.* at 335.) Villagomez put Williams in the garage and saw John "Blade" McDowell come out of the kitchen. (*Id.* at 336.) Villagomez then saw McDowell run into the kitchen and stab Chavez. (*Id.* at 336–37, 342.)

On January 11, 2013, Romero applied for an arrest warrant to arrest McDowell for Chavez's murder. (*See* Docs. 41-1 at 30; 41-1U.) The warrant application was approved by the District Attorney's office and by District Judge Louis McDonald. (*See* Docs. 41-1 at 30; 41-1U at 354.) Given what law enforcement knew about McDowell's law enforcement experience and weapons training, "his membership in the Black Berets and their affiliation with the Bandidos motorcycle club," his involvement in the distribution of drugs, and his access to firearms, law enforcement utilized the RRPD SWAT unit to effect McDowell's arrest. (Doc. 41-1 at 30.) Officers used flash bangs at the home, breached a bathroom window, and used a public address

system to advise McDowell to exit the home because officers had an arrest warrant. (*Id.* at 30–31.) McDowell exited peacefully and "was taken into custody without incident." (*Id.* at 31.) Romero did not put handcuffs on McDowell. (*Id.*)

A grand jury indicted McDowell on January 25, 2013, for Chavez's murder. (*See id.*; Doc. 27-2.) McDowell was arraigned on February 4, 2013. (Doc. 41-2 at 372.) McDowell was tried for and found guilty of Chavez's murder in December 2014. (*See* Doc. 27-4.) During the trial, the District Attorney asked Romero about McDowell's arrest and exercise of his right to counsel. *See New Mexico v. McDowell*, 411 P.3d 337, 340 (N.M. 2018). On appeal, the New Mexico Supreme Court found that the prosecutor's comments regarding McDowell's exercise of his rights constituted reversible error and vacated his conviction. *See id.* at 340, 345. The State retried McDowell in November 2019, and the jury acquitted him. (*See* Doc. 41-6.)

## III.    Analysis

Defendants first argue that McDowell's claims for false arrest, false imprisonment, and excessive force, brought pursuant to 42 U.S.C. § 1983, are time barred. (Doc. 41 at 25–26.) The parties agree that these claims are governed by New Mexico's three-year statute of limitations for personal injury claims. (*See id.* at 25 (citing *Wilson v. Garcia*, 471 U.S. 261, 280 (1985)); Doc. 46 at 7–8 (same).) Federal law determines when McDowell's claims accrued and the statute of limitations period began to run. *Smith v. City of Enid*, 149 F.3d 1151, 1154 (10th Cir. 1998). "A civil rights action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Id.* (quoting *Baker v. Bd. of Regents*, 991 F.2d 628, 632 (10th Cir. 1993)) (subsequent citation omitted). "Since the injury in a § 1983 case is the violation of a constitutional right, such claims accrue 'when the plaintiff knows or should know that his or her constitutional rights have been violated.'" *Id.* (quoting *Lawshe v. Simpson*, 16 F.3d 1475, 1478 (7th Cir. 1994))

(internal citation omitted). "This requires the court 'to identify the constitutional violation and locate it in time.'" *Id.* (quoting *Lawshe*, 16 F.3d at 1478).

### A.     Excessive Force

#### 1.     The claim for excessive force is untimely.

"A § 1983 claim for excessive force in effectuating an arrest accrues at the time of arrest." *Stevenson v. Grace*, 356 F. App'x 97, 98 (10th Cir. 2009) (quotation and subsequent citation omitted); *see also Johnson v. Johnson Cnty. Comm'n Bd.*, 925 F.2d 1299, 1301 (10th Cir. 1991). McDowell claims that Romero and his agents "used [excessive] physical force and the threat of deadly force in seizing and detaining" him and later injured him by using overly tight handcuffs. (2d Am. Compl. ¶¶ 117–18.) McDowell's claim accrued on the date of his arrest: January 13, 2013. *See Stevenson*, 356 F. App'x at 98. Because McDowell did not file his lawsuit until January 21, 2020, this claim is untimely. (*See* Doc. 1-A.)

McDowell summarily asserts that his claims are tolled pursuant to *Heck v. Humphrey*, 517 U.S. 477 (1994). (Doc. 46 at 10.) "[U]nder *Heck*, a § 1983 claim is not cognizable if it 'necessarily require[s] the plaintiff to prove the unlawfulness of his conviction or confinement.'" *Garza v. Burnett*, 672 F.3d 1217, 1219 (10th Cir. 2012) (quoting *Heck*, 512 U.S. at 486). "Accordingly, a plaintiff advancing a claim subject to the *Heck* bar is required to show that [his] conviction was reversed or otherwise set aside, and the claim does not accrue until the date the conviction is declared invalid." *Id.* (citing *Heck*, 512 U.S. at 487–90; *Wallace v. Kato*, 549 U.S. 384, 393 (2007)). "On the other hand, 'if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.'" *Havens v. Johnson*, 783 F.3d 776, 782 (10th Cir. 2015) (quoting *Heck*, 512 U.S. at 487).

11

In *Havens*, for example, the Tenth Circuit analyzed whether an excessive force claim was barred by *Heck* where the plaintiff (Havens) was convicted of assaulting an officer. *See id.* Havens "pleaded guilty to attempted first-degree assault of" the defendant officer. *Id.* at 783. At his plea hearing, Havens admitted that the defendant officer was in front of his car, and he "was gunning the engine in an effort to get away." *Id.* In his complaint for excessive force under § 1983, however, he asserted that the officer's resulting "use of force was unreasonable because Havens did not have control of the car, he did not try to escape, he never saw [the officer, and] he did not drive toward" the officer. *Id.* "In other words, he did nothing wrong and did not intend or attempt to injure [the officer]." *Id.* Because the theory of relief in his § 1983 complaint was "based on his innocence" and "could not sustain the elements of attempted first-degree assault . . . and the factual basis for [his] plea[,]" *Heck* barred him from asserting the claim unless and until his conviction was overturned. *See id.* at 783–84.

*Heck* did not similarly bar McDowell's claim. "If the *Heck* bar applied to [McDowell's] suit, his action would have accrued" in January 2018, when the state supreme court vacated his conviction, and his complaint would have been timely. *See Garza*, 672 F.3d at 1219. But McDowell's excessive force claim neither undermines nor is inconsistent with his murder conviction. *See id.*; *see also Havens*, 783 F.3d at 783. Consequently, *Heck* does not apply to change when McDowell's excessive force claim accrued, on January 13, 2013. As McDowell has not established any other basis to toll his excessive force claim, the Court finds that it is untimely and should be dismissed with prejudice.

### 2. Romero is otherwise entitled to qualified immunity for the excessive force claim.

Even if the excessive force claim was not time-barred, Defendants argue that Romero's use of force against McDowell was reasonable under the circumstances and that he is entitled to

qualified immunity. (*See* Doc. 41 at 32–34.) The Court analyzes "claims of excessive force in the context of arrests . . . under the Fourth Amendment's 'objective reasonableness' standard . . . ." *Saucier v. Katz*, 533 U.S. 194, 204–05 (2001), *receded from on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009) (quotation omitted). "A 'court assesses the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances.'" *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005) (quotation omitted). The Supreme Court in *Graham v. Connor*, 490 U.S. 386, 388 (1989), articulated factors that courts must "consider in assessing whether the force used was reasonable[, which] include: the alleged crime's severity, the degree of potential threat that the suspect poses to an officer's safety and to others' safety, and the suspect's efforts to resist or evade arrest." *Marquez*, 399 F.3d at 1220 (citation omitted).

As an initial matter, Romero affirmed in his declaration that he did not put handcuffs on McDowell. (Doc. 41-1 at 31.) As McDowell fails to dispute this fact, he may not maintain a claim for excessive force based on overly tight handcuffing by Romero.

Regarding Romero's decision to brandish weapons and use flash bangs, the *Graham* factors weigh in favor of qualified immunity. McDowell was being arrested for murder, a serious crime. Romero knew that McDowell was a retired police officer with training in the use of weapons. He was involved in the distribution and sale of illegal substances, and he reportedly had access to weapons. He was also a member of the Black Berets, a group associated with the Bandidos motorcycle club. Under these circumstances, the Court finds that Romero's use of the SWAT team, who brandished firearms and employed flash bangs, was objectively reasonable.

In *Holland ex rel. Overdorff v. Harrington*, the Tenth Circuit found that the decision to deploy a SWAT team did not constitute excessive force where the officers were executing an arrest warrant for a misdemeanor charge on a suspect with no criminal record, had no reason to believe the suspect would physically resist arrest, and knew that children were likely present at the location. *See* 268 F.3d 1179, 1190–91 (10th Cir. 2001). The circumstances here were arguably more dangerous than those in *Holland*. McDowell fails to cite any authority to show that Romero violated his constitutional rights in deciding to use the SWAT team.

Similarly, McDowell fails to show that the use of flash bangs violated his constitutional rights. While the Tenth Circuit has found "that use of flash grenades should not be a 'routine matter,'" their use may be objectively reasonable depending on the facts and circumstances the officers face. *See Hernandez v. Conde*, 442 F. Supp. 2d 1141, 1157 (D. Kan. 2006) (quoting *United States v. Myers*, 106 F.3d 936, 940 (10th Cir. 1997)). In *Myers*, officers used flashbang devices in a home where they knew children were asleep. *Myers*, 106 F.3d at 940. The Tenth Circuit noted that this fact gave the court "great pause" but found the use objectively reasonable where "the agents knew that [the subject] had a history of illegal drug trafficking, . . . had spent time in federal prison for a fire bombing incident[,]" and likely had "an illegal marijuana growing operation" at the residence. *Id.* Here, the Court finds that the use of flash grenades was appropriate where McDowell was being arrested for murder, was ex-law enforcement with weapons training and access to weapons, and was known to be involved in the sale of illegal substances. Because McDowell fails to show a violation of his constitutional right to be free from excessive force, Romero is entitled to qualified immunity on this claim.

### B.    False Arrest and False Imprisonment

"[A] plaintiff who claims that the government has unconstitutionally imprisoned him has

at least two potential constitutional claims." *Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008). "Unreasonable seizures imposed without legal process precipitate Fourth Amendment false imprisonment claims." *Myers v. Koopman*, 738 F.3d 1190, 1194 (10th Cir. 2013) (citing *Wallace*, 549 U.S. at 389). "Unreasonable seizures imposed with legal process precipitate Fourth Amendment malicious-prosecution claims."[2] *Id.* (citing *Heck*, 512 U.S. at 484).

### 1.   Were McDowell bringing claims under the Fourth Amendment for false arrest and false imprisonment, they would be untimely.

McDowell titles his claims "false arrest" and "false imprisonment." (*See* 2d Am. Compl. ¶¶ 64–77; Doc. 46 at 10.) Defendants argue that such claims are untimely. (*See* Doc. 41 at 25 (asserting that "[a] Fourth Amendment claim for false arrest/false imprisonment accrues when the victim is released from custody or is bound over on charges") (citations omitted).) Claims for false arrest or false imprisonment brought under the Fourth Amendment are comprised of "[t]he period of time between an unlawful arrest and the institution of legal process . . . ." *Mondragon*, 519 F.3d at 1083; *see also Wallace*, 549 U.S. at 389 ("to determine the beginning of the limitations period [for false arrest or false imprisonment],[3] we must determine when petitioner's false imprisonment came to an end"). The claims accrue "either when the victim is released or when the victim's imprisonment becomes 'pursuant to [legal] process—when, for example, he is bound over by a magistrate or arraigned on charges.'" *Mondragon*, 519 F.3d at 1082–83 (quoting *Wallace*, 549

---

[2] "Unreasonable seizures that occur after the institution of legal process can also form the basis for Fourteenth Amendment malicious-prosecution claims where an adequate state remedy does not exist." *Myers*, 738 F.3d at 1194 n.3 (citing *Mondragon*, 519 F.3d at 1082). That is not the case here, as McDowell had a claim for malicious prosecution under § 41-4-12 of the New Mexico Tort Claims Act available. (*See* Doc. 25 ¶¶ 94–99.)

[3] The *Wallace* court explained that "[f]alse arrest and false imprisonment overlap; the former is a species of the latter." 549 U.S. at 388. Thus, the Court "refer[red] to the two torts together as false imprisonment." *Id.* at 389.

U.S. at 389). "Thus, either the date of release or the date of sufficient legal process starts the statute of limitations running for the Fourth Amendment claim." *Id.* at 1083.

Defendants assert that the "legal process" started when McDowell was arraigned, on February 4, 2013. (*See* Doc. 41 at 26.) They argue that the applicable three-year statute of limitations expired on February 4, 2016. (*Id.*) Legal process here, though, began even earlier. "At common law, the issuance of an arrest warrant represents a classic example of the institution of legal process." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008) (citation omitted); *see also Wallace*, 549 U.S. at 389 (noting that where an officer did not have an arrest warrant, the allegations arose from a seizure without legal process). In this case, the judge signed the arrest warrant on January 12, 2013, and Romero arrested McDowell the next day. (*See* Docs. 41 at 21; 41-1 at 30; 41-1U at 354.) Regardless, McDowell did not file any claim under the Fourth Amendment within three years of 2013, and these claims are untimely and dismissed with prejudice.[4]

### 2. Romero is entitled to qualified immunity on any claim for malicious prosecution, because probable cause existed for the arrest.

From his scant argument on this issue, it appears that McDowell intends to bring a claim for malicious prosecution under the Fourth Amendment. He alleges that the false arrest and false imprisonment claims are based on Romero's decision to pursue McDowell even though Romero had insufficient evidence and because McDowell exercised his Fifth Amendment right to remain

---

[4] To the extent McDowell argues that *Heck* applies to toll this claim, the Court disagrees. The *Wallace* court reasoned that "[t]olling the limitations period for a false arrest/false imprisonment claim until an anticipated conviction is set aside . . . would be 'impractical' because it would call for speculation as to whether a conviction will result and whether the civil suit would impugn that conviction." *Small v. Huddleston*, 511 F. App'x 765, 768 (10th Cir. 2013) (citing *Wallace*, 549 U.S. at 393). "The proper procedure . . . is for the plaintiff to timely file his civil case and, if any obstacles arise with having both cases running concurrently, the trial court can stay the civil proceedings until the conclusion of the criminal case." *Id.* (citing *Wallace*, 549 U.S. at 393–94).

silent upon his arrest. (*See* 2d Am. Compl. ¶¶ 64–77; Doc. 46 at 10.) In essence, McDowell argues that Romero arrested him without probable cause. A malicious prosecution claim would not have accrued until after McDowell's conviction was vacated. *See Myers*, 738 F.3d at 1194. The state supreme court vacated McDowell's conviction in January 2018, within three years of the date he filed his complaint. A claim for malicious prosecution is timely.

To establish a claim for malicious prosecution under § 1983, the plaintiff must show that: "(i) the defendant caused the plaintiff's continued confinement or prosecution; (ii) the original action terminated in favor of the plaintiff; (iii) no probable cause supported the original arrest, continued confinement, or prosecution; (iv) the defendant acted with malice; and (v) the plaintiff sustained damages." *Chavez v. Cnty. of Bernalillo*, 3 F. Supp. 3d 936, 981–82 (D.N.M. 2014) (citing *Wilkins*, 528 F.3d at 799). At issue here is the third element—whether Romero had probable cause to arrest McDowell.

"[A]n arrest is valid and does not violate the Fourth Amendment if the warrant underlying it was supported by probable cause at the time of its issuance; this holds true even if later events establish that the target of the warrant should not have been arrested." *Bruner v. Baker*, 506 F.3d 1021, 1026 (10th Cir. 2007) (quotation omitted). "Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime." *Id.* (quotation omitted). "Arrest warrant affiants violate the Fourth Amendment when they 'knowingly . . . , or with reckless disregard for the truth,' include false statements in the affidavit, *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978), or 'knowingly or recklessly omit from an arrest affidavit information which, if included, would have vitiated probable cause.'" *Id.* (quoting *Stewart v. Donges*, 915 F.2d 572, 582–83 (10th Cir. 1990)).

Giving McDowell's brief the most generous reading, he theorizes that Romero knowingly or recklessly included false statements in the affidavit for the warrant. (*See* Doc. 46 at 9–10.) The Supreme Court held in *Franks* that "where the defendant makes a substantial preliminary showing that" an affiant "knowingly, or with reckless disregard for the truth," includes a false statement in an affidavit for a warrant, "if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." 438 U.S. at 155–56. There is a presumption that Romero's warrant affidavit is valid. *See id.* at 171. To overcome this presumption, McDowell "must present evidence showing that essential facts in the warrant affidavit are false." *Higgins v. Baca*, No. 11 CV 757 JAP/ACT, 2012 WL 13070069, at *9 (D.N.M. Dec. 4, 2012).

> [T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished . . . . Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Id.* (quoting *Franks*, 438 U.S. at 171–72).

Here, McDowell submits no affidavit nor cites record evidence to make "a substantial preliminary showing that the essential facts of" Romero's warrant affidavit are false.[5] *See id.*

---

[5] McDowell argues without evidentiary support that "Romero decided that [he] was the murderer" based on "the testimony of two co-defendants, who were given immunity to provide the state with the desired testimony in exchange for leniency." (Doc. 46 at 9.) Romero testified in his affidavit, however, that the witnesses provided their statements before they received any grant of immunity. (Doc. 41-1 at 30.) McDowell fails to submit any evidence to dispute this fact or to show that the statements were not otherwise voluntary. Further, McDowell cites no authority to support a finding that probable cause may not exist where accomplices' statements form part of the probable cause determination. (*See* Doc. 46.) Indeed, in *Claeys v. Mohr*, the Tenth Circuit upheld a grant of summary judgment in favor of two defendant detectives on the basis "that a finding of probable cause necessary to support a warrant may be predicated entirely on

18

Instead, he summarily asserts that "Romero obtained his arrest warrant and pursued [McDowell] in bad faith, based on perjured statements of known drug users, who were used to provide false information to law enforcement in exchange for immunity." (*Id.* at 10.) Yet this unsupported argument does not meet his burden to avoid summary judgment. *See Tanner*, 864 F. Supp. 2d at 1106 (noting that a party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation") (quotation and citation omitted). As McDowell fails to meet his burden, Romero "is entitled to qualified immunity on [this] claim." *See Higgins*, 2012 WL 13070069, at *10 (citing *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001)). "Bare allegations of misrepresentation do not suffice to undermine the presumption of validity accorded an affidavit supporting a warrant request." *Id.* (quotation omitted). "*A fortiori*, a plaintiff in a civil suit cannot, merely by alleging that information in the affidavit is incorrect, strip an affiant of his qualified immunity." *Id.* (quotation and citation omitted). Because McDowell cites no evidence to support his assertion that Romero knowingly or recklessly included false information in his affidavit, Romero is entitled to qualified immunity on this claim.

Moreover, the Court finds that probable cause existed here. In the affidavit supporting the arrest warrant, Romero first detailed the information he had learned about the feud between Chavez and Catherine Chavez and the threats John "Blade" McDowell made against Chavez's life, including the incident in which John "Blade" McDowell allegedly held Chavez at gunpoint. (*See* Doc. 41-1U at 355–56.) Romero recounted Catherine Chavez's interview and assertion that she

---

the confession of a self-confessed co-conspirator, without running afoul of the Constitution." 681 F. App'x 691, 693 (10th Cir. 2017) (quotation marks and citation omitted).

McDowell also complains that there was no forensic evidence tying him to the murder. (*See* Docs. 25 ¶ 67; 46 at 5.) As Defendants note in their motion, however, "forensic evidence . . . is not required for a probable cause determination." (Doc. 41 at 29.) *See also, e.g.*, *Claeys*, 681 F. App'x at 693. McDowell cites no authority to refute Defendants' argument. (*See* Doc. 46.)

and John "Blade" McDowell were together on the night of the murder, although phone records did not support that story. (*Id.* at 356, 358.) John "Blade" McDowell admitted [in his interview] to looking for [Chavez] because [Chavez] had stolen" from him. (*Id.* at 358.) Catherine Chavez verified that McDowell and John "Blade" McDowell "were looking for [Chavez] because he had stolen from them." (*Id.* at 359.)

Romero included information from the interviews of Williams and Dinelli, both of whom were present at the Chavez House and stated that they were confronted by three men. (*Id.* at 357.) Williams stated that one of the men—"an older man with gray hair, who was tall and heavyset"— carried a knife. (*Id.*) Williams heard "sounds of violence" and Chavez cry out in response to accusations that he had stolen from the men. (*Id.*) Romero reported that Williams and Dinelli "described [an] older male who stabbed [Chavez and who] fit the description of" McDowell. (*Id.*)

Finally, the affidavit described Catherine Chavez's June 2012 arrest on an unrelated matter and subsequent interview in which she stated that McDowell stabbed Chavez. (*See id.* at 359.) In November 2012, Romero re-interviewed Dinelli after an unrelated arrest, and Dinelli stated that he had lied in his previous statement because he was "too scared to tell the truth . . . ." (*Id.* at 359– 60.) Dinelli stated that McDowell stabbed Chavez, and he identified McDowell in a photo array. (*Id.* at 360.) Romero recounted his interview with VillaGomez in November 2012. (*Id.*) VillaGomez stated that he saw McDowell stab Chavez. (*Id.*) The Court finds that the facts alleged in the warrant demonstrate a substantial probability that McDowell committed the murder of Chavez. *See Wilkins*, 528 F.3d at 801. Romero is entitled to qualified immunity on the malicious prosecution claim, and the Court dismisses the claim with prejudice.[6]

---

[6] Similarly, Romero is entitled to qualified immunity if the claims for false arrest and false imprisonment were not time-barred. *See Kerns v. Bader*, 663 F.3d 1173, 1187 (10th Cir. 2011 (noting that false arrest, false imprisonment, and malicious prosecution all require the plaintiff to show that the "arrest and detention were without probable cause")).

### C.  Wrongful Conviction

McDowell claims in Count I that Defendants are liable for wrongful conviction under 28 U.S.C. § 2513 and 28 U.S.C. § 1495. (Doc. 26 ¶¶ 54–63.) He asserts that his conviction was "overturned . . . based upon the combination of prosecutorial misconduct due to Defendant Romero's investigation and resulting court testimony, plain error based upon constitutional violations and insufficient evidence." (*Id.* ¶ 58.) Defendants contend that the claim is improperly brought under §§ 2513 and 1495, which "pertain to federal crimes, and therefore are inapplicable here, where [McDowell] alleges he was wrongfully convicted of crimes in New Mexico state court." (Doc. 41 at 34.)

"28 U.S.C. § 1495 gives the United States Court of Federal Claims 'jurisdiction to render judgment upon any claim for damages by any person unjustly convicted of an offense against the United States and imprisoned.'" *United States v. Ford*, No. CR 02-0154 JC/LAM, 2008 WL 11450524, at *2 (D.N.M. Dec. 19, 2008), *R&R adopted*, No. CR 02-0154 JC/LAM, 2009 WL 10708529 (D.N.M. Jan. 21, 2009). Section 1495 does not apply to McDowell's conviction, as he was not convicted of an "offense against the United States." 28 U.S.C. § 1495; *see also, e.g.*, *Robinson v. United States*, 230 F.3d 1382, 1382 (Fed. Cir. 2000) (holding that the Court of Federal Claims lacked subject matter jurisdiction over plaintiff's § 1495 claim because he was convicted in Indiana state court). Consequently, the Court will dismiss Count I for failure to state a claim.[7]

Nor can McDowell bring a claim under 28 U.S.C. § 2513. Section 2513 "sets forth the 'requisite facts' that '[a]ny person suing under section 1495 . . . must allege and prove.'" *Emerson v. United States*, 123 Fed. Cl. 126, 128 (2015) (quoting 28 U.S.C. § 2513(a), (b)). Because McDowell cannot state a claim under § 1495, § 2513 is also inapplicable here.

---

[7] If McDowell had been convicted of an offense against the United States, this Court would not have jurisdiction to hear the claim, as § 1495 gives jurisdiction to the United States Court of Federal Claims.

To the extent McDowell brings a claim for "wrongful conviction" under 42 U.S.C. § 1983, it appears that his claim is really one for "malicious prosecution." As explained above, Romero is entitled to qualified immunity on a malicious prosecution claim.[8]

## IV.   Conclusion

The Court concludes:

Count I: McDowell fails to state a claim for "wrongful conviction" under 28 U.S.C. §§ 1495 or 2513, and any such claim is dismissed without prejudice.

Counts II and III: McDowell's claims for false arrest and false imprisonment are untimely and dismissed with prejudice. To the extent he brings a claim for "malicious prosecution," McDowell is entitled to qualified immunity and the claim is dismissed with prejudice.

Count VIII: McDowell's claim for excessive force is untimely and is dismissed with prejudice.

Because McDowell fails to establish any constitutional violation by Romero, the Court also dismisses his claims against the City of Rio Rancho and the RRPD. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317–18 (10th Cir. 2002) ("We will not hold a municipality liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers.") (quotation marks and citation omitted).

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment as to Federal Claims (Doc. 41) is **GRANTED**.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE

---

[8] McDowell agrees that Romero is entitled to absolute immunity for any claim based on his trial testimony. (*See* Doc. 46 at 9.)